UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BIANCA G.,

**Plaintiff,**

　　v.                                                                    Case No. 1:22-cv-00188-TPK

**COMMISSIONER OF SOCIAL**              **OPINION AND ORDER**
**SECURITY,**

**Defendant**.

## OPINION AND ORDER

　　Plaintiff filed this action under 42 U.S.C. §405(g) seeking review of a final decision of the Commissioner of Social Security. That decision, issued by the Appeals Council on January 6, 2022, denied Plaintiff's application for disability insurance benefits. Plaintiff has now moved for judgment on the pleadings (Doc. 6), and the Commissioner has filed a similar motion (Doc. 7). For the following reasons, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, **GRANT** the Commissioner's motion, and **DIRECT** the Clerk to enter judgment in favor of the Defendant.

## I.  BACKGROUND

　　Plaintiff filed her application for benefits on May 27, 2020, alleging that she became disabled on May 18, 2017. After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on August 13, 2021. Plaintiff and a vocational expert, Esperanza DiStefano, both testified at the hearing.

　　In a decision dated October 26, 2021, the Administrative Law Judge denied benefits. He found, first, that Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2020, and that she had not engaged in substantial gainful activity since her alleged onset date. Next, he determined that she had severe impairments including history of brain tumor, status post removal with shunt placement, and hydrocephalus. He also concluded, however, that her impairments, considered singly or in combination, did not meet or equal the level of severity required to qualify for disability under the Listing of Impairments.

　　Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform a limited range of work at the light exertional level. She could not crawl, balance, climb ladders, ropes, or scaffolds, or tolerate exposure to extreme heat or excessive moisture or humidity, but she could occasionally stoop, kneel, crouch, and climb ramps or stairs. Additionally, she could tolerate moderate exposure to office noise but could not tolerate exposure to excessive vibration or hazards such as unprotected heights or

moving machinery or exposure to bright or flashing lights.  Finally, she was limited to the performance of simple, routine tasks that did not involve production-rate or pace work.

Plaintiff did not have any past relevant work, but the ALJ determined that, with these limitations, she could do certain unskilled light jobs including marker, router, and mail clerk.  He also found that such jobs existed in significant numbers in the national economy.  As a result, the ALJ concluded that Plaintiff did not meet the requirements for disability under the Social Security Act.

In her motion for judgment on the pleadings, Plaintiff raises this issue:

The ALJ's mental RFC finding is not based on substantial evidence and instead the product of the ALJ's own lay judgment, substantial mischaracterization of the record, and failure to properly evaluate the treating opinions per the new regulations.  (Doc. 6-1, at 1).

## II.  THE KEY EVIDENCE

### A.  Hearing Testimony

Plaintiff, who was 24 years old at the time of the administrative hearing, first testified that she did got brain cancer at the end of her sophomore year in college.  She was treated with surgery and radiation, including the implantation of a shunt.  She then returned to college and graduated in 2020 with a degree in English and philosophy.  Plaintiff said that she was provided accommodations from her professors and that she struggled with frustration and anxiety.  She testified that she was physically weaker after the cancer and that even a light duty job would tire her out.  She did try to walk every day.  Plaintiff also said that if she were sitting or standing up for long periods of time her shunt would drain and she would have to lie down periodically.  She was able to do freelance writing and earn money doing so, and she did painting as a hobby.

When asked about routine activities, Plaintiff said she had done karaoke once but did not return because she got overwhelmed in large spaces.  She did some nonprofit volunteer work, and she had spent time talking to doctors and collecting paperwork for her disability case.  Plaintiff was not able to drive due to attention deficits and said she lived with her parents.  She suffered from migraines brought on by humid weather and they could last four to six hours.  Plaintiff also experienced double vision, although it had gotten better as time passed.  When asked about panic attacks, Plaintiff testified that she had gotten them at jobs in the past and also in social settings and that she discussed this problem with her doctors.  Lastly, she said that she had problems dealing with heat, which caused fatigue.

The vocational expert, Ms. DiStefano, was asked to assume that Plaintiff had no past relevant work, and was then asked questions about a person with Plaintiff's vocational profile who was limited to light work with a number of postural and environmental limitations.  She replied that such a person could work as a marker, router, or mail clerk, all unskilled positions.  If

the person were also limited to simple, routine tasks and no production or pace rate work, she could still do those jobs. Next, she testified that if the person were limited to working at the sedentary exertional level, she could do jobs like document preparer, election clerk, and addresser. She also gave numbers for all of these jobs as they existed in the national economy. No jobs would exist, however, for someone who could not complete a 40-hour work week or who would miss a day of work per week. The same would be true for someone who would be off task 20% of the time.

### B. Medical Evidence

The relevant treatment records show the following. Plaintiff underwent a head CT scan on May 14, 2017, which revealed a lesion at the base of the fourth ventricle in the brain with associated hydrocephalus. An MRI confirmed that finding. Two days later, the lesion was surgically removed. At a later evaluation, radiation was recommended, and it was started but was temporarily suspended because Plaintiff developed headaches which appeared to be caused by obstructive hydrocephalus. A shunt was recommended. It was implanted on July 14, 2017 and she was discharged from the hospital two days later. She reported some double vision, which improved after the surgery, as well as some blurring of her peripheral vision. Plaintiff then continued her radiation treatment, completing it on September 1, 2017.

There are a number of records from DENT neurologic institute. They show, generally, that Plaintiff reported being easily fatigued and that she also had mild depression and anxiety with occasional crying spells. By May of 2018, she was reporting problems with concentration and short-term memory loss as well and was diagnosed with cognitive dysfunction, depression with anxiety, and episodic headaches. The following month, she said her headaches occurred less often but were more severe, and that her anxiety had improved with medication. By the time she next was seen, she had returned to school and said that anxiety was no longer an issue. In 2019, Plaintiff said that her migraines were now happening only 2-3 times per month and that any issues with concentration and attention had resolved. She still consistently reported fatigue, however, and the notes show she was receiving mental health treatment and was also being evaluated for complaints of confusion and memory loss.

During this same time frame, Plaintiff was being seen by BestSelf Behavioral Health, Inc. Her initial diagnosis was unspecified anxiety and depressive disorders. She reported poor concentration, distractibility, and restlessness as well as panic attacks going back to her high school years. She coordinated her counseling with medication management and reported good results. She also said that pursuing hobbies and freelance writing had helped her considerably. By July of 2020 she told her counselor she had been doing well mentally but was struggling to cope with the heat. Progress notes from 2020 indicate that she was still reporting depressed and anxious mood, however, and she was judged to be at risk for impulsivity.

Plaintiff was also seen by a neuropsychologist in 2019, Dr. Santa Maria. He administered a battery of tests and concluded that she suffered from mild neurocognitive disorder, mild depressive disorder, and generalized anxiety disorder. Her areas of deficiency included significant difficulties with complex instructions and sustained attention, but he thought

she could handle either part-time or full-time employment at a job like the one she had in a deli, or a job that did not have a particularly heavy workload or fast pace.

### C. Opinion Evidence

Plaintiff's counselor, Carl Chinn, and Nurse Practitioner Simpson completed a mental medical source statement on July 20, 2021. They stated that Plaintiff's diagnoses included PTSD, depressive and anxiety disorders, and ADHD, and they checked boxes indicating that, among other symptoms, Plaintiff had difficulty with thinking and memory impairment and that she was limited to performance of many mental functions to either 20% of the workday or not at all. They also believed she would be off task more than 30% of the workday and would miss more than four days of work per month. (Tr. 1455-59).

On August 4, 2021, Dr. Castaglia, who was treating Plaintiff for her surgery and associated follow-up, reported that, from a neurological standpoint, Plaintiff's prognosis was good but that she had bilateral hand tremors, some balance problems, fatigue, and some headaches, especially in high-stress situations. He believed her symptoms would seldom interfere with her attention and concentration, however, and said she could both stand and sit for more than two hours at a time and up to six hours a day. Dr. Castaglia also said that Plaintiff would need to take a half-hour break every two to three hours in order to sit quietly. Nevertheless, he thought her capable of doing a low stress job and said she would miss only one day of work per month. (Tr. 1462-66).

Dr. Tarkmi, one of the physicians at Elmwood Health Center and a primary care physician, completed a Primary Source Statement on August 20, 2021. She appears to have seen Plaintiff on only two or three occasions and noted she was also treating Plaintiff for major depression and anxiety. She described Plaintiff's symptoms as headache, fatigue, and left-sided weakness. The restrictions she identified included no exposure to fumes, dust, odors, or gases, the need to be able to change positions at will, the need to take five unscheduled work breaks per day lasting 15 minutes each, and the need to miss about four days of work per month. She also said that Plaintiff could perform most work-related mental activities for only 20% of the workday but, on the other hand, she could perform a low-stress job. (Tr. 1478-85).

There are also opinions in the record from state agency reviewers. Dr. Dekeon opined on July 10, 2020, that Plaintiff did not have a severe mental impairment because "her psychiatric conditions cause no more than mild impairment on her ability to function on a daily basis." (Tr. 101). That assessment was affirmed by another reviewer, Dr. Brown. Other reviewers assessed Plaintiff's physical capacity and found her capable of light work.

### III. STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

Plaintiff's claim of error focuses on the ALJ's mental residual functional capacity finding.  She notes that the opinion evidence on this subject presents a stark contrast between two opinions - from state agency reviewers Drs. Dekeon and Brown - that she did not have a severe mental impairment, and three opinions, all from treating sources, that her mental impairments were disabling.  She points out that the ALJ's brief discussion of the issue of mental impairments did not take into account her frequent complaints of problems with attention, concentration, and memory, and argues that the ALJ essentially mischaracterized the record in order to justify his decision.  She also contends that the ALJ did not fully analyze Dr. Santa Maria's report, choosing to focus only on his view that Plaintiff could do simple work like her part-time deli employment and disregarding his belief that Plaintiff would do best when on task for only 10-15 minutes at a time.  Finally, she asserts that the ALJ did not properly evaluate either the consistency or supportability factors as required by the current regulations.  The Commissioner responds that the ALJ properly determined that the more restrictive opinions were both inconsistent with and unsupported by the record as a whole, including numerous normal findings on mental status examinations and Plaintiff's activities of daily living.

Here is what the ALJ said concerning Plaintiff's mental impairments.  First, when considering whether they were severe, the ALJ reasoned that

> [m]ental health treatment notes, mostly dated after the date last insured, show that the claimant generally responded well to psychotropic medication management and outpatient counseling, and there is no significant evidence of mental work-related functional limitations through the date last insured (Exhibits 11F, 21F, and 31F). Based on the overall evidence in the record, I find that the claimant's medically determinable mental impairments, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore non-severe through the date last insured.

(Tr. 8). Next, when assessing her mental residual functional capacity, the ALJ had this to say:

> In addition, the specific medical opinions in the record are also inconsistent with the allegations of disabling work-related functional limitations through the date last insured. In November 2019, neuropsychologist Michael P. Santa Maria, Ph.D., concluded that "my impression is that [the claimant] retains adequate cognitive capacity to handle part-time or full-time competitive employment of this nature [at a deli], and she demonstrates a good capacity to progress into more demanding work roles…however, she appears to be an individual who would benefit from seeking employment in which there is not a particularly heavy workload or fast pace of work, given weaknesses demonstrated in complex and sustained attention in particular, which appear to have sound neural underpinnings" (Exhibit 27F, page 8).
>
> ***
>
> As for the claimant's mental functioning, reviewing psychological consultants Dr. Dekeon and Dr. Brown both opined that the claimant's mental impairments were non-severe through the date last insured (Exhibit 1A, pages 5-6; Exhibit 3A, pages 9-10; Exhibits 13F and 18F). In November 2020, Tanya Geist from the DENT Institute wrote that the claimant "has not been seen since December 2019…neuro-psychometric testing identified mild neurocognitive disorder secondary to ependymoma and shunt with overlay of generalized anxiety disorder and mild major depression" (Exhibit 14F, page 2; *see* Dr. Santa Maria's report discussed above).
>
> ***
>
> I find that the opinions of psychological consultants Dr. Dekeon and Dr. Brown are persuasive due to their mental health expertise, their review of the claimant's medical records, and the consistency of their opinions with each other and the evidence through the date last insured, including the claimant's good performance in college (Exhibits 1A, 3A, 13F, and 18F). I also find that the November 2019 report of neuropsychologist Dr. Santa Maria is persuasive due to his expertise, his standardized testing of the claimant, his interview and history of the claimant, and the relative consistency of his conclusions with the medical evidence (Exhibit 27F).

> I find that the opinions in the July 2021 medical source statement of the claimant's treating mental health practitioners at Best Self, including Paula M. Simpson, N.P., and Carl Chinn, LMHC, are not persuasive because they are not consistent with the evidence in the record through the date last insured, including treatment note observations and clinical findings (Exhibit 25F). In this check-box medical source statement, the mental health practitioners indicated that the claimant is either precluded entirely or precluded for more than 20% of an eight hour workday in the abilities to remember work-like procedures, understand, remember, and carry out very short and simple instructions, understand, remember, and carry out detailed instructions, maintain attention for two-hour segments, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, and deal with normal work stress; they also indicated that the claimant has poor distress tolerance, has difficulty regulating emotions, will be off-task for more than 30% of an eight-hour workday, and will be absent from work for more than four days per month. I note that these opinions directly contradict mental status examination clinical findings and the well-supported opinions of psychologists Dr. Dekeon and Dr. Brown and neuropsychologist Dr. Santa-Maria, as discussed above. Nonetheless, the treating sources have regularly treated the claimant; their assigned limitations were carefully considered in balance with the overall medical evidence. In part due to the restrictions in Exhibit 25F (as well as the limitations noted by Dr. Santa Maria), the mental limitations in the above listed residual functional capacity are more restrictive than those indicated by reviewing psychologists Dr. Dekeon and Dr. Brown. The extensive limitations in this medical source statement were not adopted in full primarily due to their inconsistency with the medical evidence. Meanwhile, the off-task and absences-from-work opinions were not adopted at all, as they appear speculative, are unsupported by clinical findings, and are inconsistent with the recent hearing testimony regarding a freelance writing career and a 3.8 grade point average.

(Tr. 11-14).

Plaintiff correctly notes that under current regulations, the two key factors to be used in evaluating expert medical opinions are the extent to which the opinions are supported by, and consistent with, the other evidence of record. As this Court has said,

> [s]upportability and consistency are the most important of the five regulatory factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Accordingly, the ALJ "will explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id*. §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added). The ALJ may, but is not

required to, explain how he considered the remaining three factors. *Id*. An ALJ's failure to explain the supportability and consistency of the medical opinions or prior administrative medical findings in the record is procedural error. *Loucks v. Kijakazi,* No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order). However, if a searching review of the record assures the court that "the substance of the regulation was not traversed," a court may affirm the Commissioner's decision despite the error. *Id*. (*quoting Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)) (alterations omitted).

*Brianne S. v. Comm'r of Soc. Sec.*, 2023 WL 6225249, at *4 (W.D.N.Y. Sept. 26, 2023).

Here, as a review of the ALJ's decision quoted above indicates, the ALJ extensively analyzed all of the expert opinions dealing with Plaintiff's mental health impairments. Plaintiff is partially correct that there is a stark conflict between the opinions of, in particular, Drs. Dekeon and Brown, on the one hand, and Dr. Tarkmi, Counselor Chinn, and Nurse Practitioner Simpson, on the other hand, but that does not tell the whole story. The ALJ also found Dr. Santa Maria's opinion to be persuasive and placed great reliance on it. The ALJ also discussed the extent to which both that opinion and the opinions of the state agency reviewers were supported by other evidence in the record and were consistent with that evidence and with each other, and the evidence cited by the ALJ - which the Court has summarized above - can reasonably be read to support the conclusion that Plaintiff did not, prior to her last insured date, experience symptoms due to her mental impairments that had a significant impact on her ability to perform work-related functions, or at the very least, functions that are inconsistent with the ability to do simple work without production quotas.

Plaintiff does argue that the ALJ misread Dr. Santa Maria's opinion so that his reliance on it as evidence that Plaintiff can be employed was not reasonable. However, the Court disagrees. Although Dr. Santa Maria did say that Plaintiff would do best with short breaks, he did not say she needed them in order to function, and he clearly stated that she was able to perform a simple, reasonably paced job on a full-time basis. The ALJ was entitled to rely on his report as a basis for determining that Plaintiff could do so. As here, where there are conflicting opinions and the evidence has support for either view, the ALJ is entitled to resolve the conflict. As this Court has said, "it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record where the record provides sufficient evidence for such a resolution ...." *Elizabeth I. v. Comm'r of Soc. Sec.*, 2025 WL 723157, at *9 (W.D.N.Y. Mar. 6, 2025). Because that is the case here, the Court will affirm the Commissioner's decision.

## V. CONCLUSION AND ORDER

For the reasons stated above, the Court **DENIES** Plaintiff's motion for judgment on the pleadings (Doc. 6), **GRANTS** the Commissioner's motion (Doc. 7), and **DIRECTS** the Clerk to enter judgment in favor of the Defendant Commissioner of Social Security Commissioner.

**/s/ Terence P. Kemp**
**United States Magistrate Judge**